OLIVIA PHELPS, sole acting executrix of Anson G. Phelps deceased, *vs.* ANSON G. PHELPS, jun. and others.

A testator, by the first section of his will, fully authorized and empowered his executors "or such one or more of them as may prove this my will, and the survivors and survivor of them, to sell and convert into money all my estate, real and personal whatsoever, and wheresoever, (except my present homestead and lands hereinafter devised to my wife,) and either at public or private sale, and upon such terms as they may think most conducive to the interest of my estate; and to make, execute and deliver good and sufficient deeds and conveyances therefor, to the purchasers thereof." It appearing, from the whole will, to have been the intention of the testator to have the real estate converted into money; and the most important purposes and provisions of the will appearing to call for such conversion, and to be incapable of execution without it; *it was held* that in construing and giving effect to the will, the power to sell must be considered as having been exercised, by the executors, and the real estate as converted into money.

Although there was no express direction, in the will, to sell, yet as the execution of the power to sell was not made expressly to depend on the will of the executors, it was therefore imperative. INGRAHAM, J. dissented.

The testator, by the 9th clause of his will, gave and bequeathed to each of his children, who should be living at the end of ten years after his decease, the sum of $100,000, provided his son A. G. or his son-in-law D. should either of them be living; but in case they both should die before that time. then he gave $100,000 to each of his children, who should be living at the death of the survivor of them. By other clauses of the will legacies were given to various persons, and to religious societies, payable in ten annual installments, commencing in three, five, and seven years. By the 20th clause, the testator declared that after paying and satisfying or providing for the payment of the legacies and bequests, in full, as to all the rest, residue and remainder of his estate, he gave, devised and bequeathed the same to his children and grandchildren, as follows : he ordered and directed the same to be divided into as many shares as he should have children and grandchildren living at the end of ten years after his decease; provided A. G. or D. should either of them be living at that time. But if, before the expiration of ten years from his death, A. G. and D. should both die, then at the decease of the survivor of them, he ordered and directed his said residuary estate to be divided into as many shares as he should have children and grandchildren living at the time of the decease of such survivor; it being his intention that each child and grandchild should be placed upon an equal footing, as to the said residue, and each child and grandchild receive one equal share of his residuary estate, upon such division, as soon thereafter as could conveniently be done. By the 21st clause, the testator directed that in case his wife should die before the division of his residuary estate, the fund re-

Phelps *v.* Phelps

served by the executors to secure an annuity to her should fall into the bulk of his estate, and form a part of such residue; but in case she should live beyond that period, then the annuity fund should, at her decease, be divided into as many shares as he should have children and grandchildren living at her decease; and that each then living child and grandchild, in respect to said fund, should stand upon an equal footing, and each receive one equal share thereof.

*Held* 1. That by the residuary clause the testator did not intend to give the residuary estate to his children and grandchildren living at the time of his death, absolutely, subject to be divested &c., *to be paid* at the end of ten years, or sooner, if the life nominees both died before; but that he intended to give it only to such children and grandchildren as should be living when the residue should be divided; and that, consequently, the legacies were executory and contingent. And so as to the legacies of $100,000 given to each of the children, by the 9th clause.

2. That although during the trust and until the contingent future interests should vest, there was a suspension of the power of absolute disposition of the bulk of the estate, and was intended to be, yet that such suspension was not unlawful, inasmuch as the division of the estate must take place either at the expiration of the two lives mentioned, or within the continuance of at least one of the lives.

3. That if the widow should die before either of the residuary life nominees, and her annuity fund should fall into the bulk of the estate, and be divided before the end of the ten years, on the death of the survivor of the life nominees, under the residuary clause, the alienation of the fund would have been suspended for three lives. That the first limitation over of the widow's annuity fund was therefore void.

4. That the limitation over of the widow's annuity fund, to the children and grandchildren living at the decease of the widow, in case she should die after the division of the residue, contained in the 21st clause of the will, was valid.

5. That no direction or provision of the will was void as involving an illegal restraint of the absolute alienation of any part of the estate; except the first limitation of the 21st clause.

6. That there was no unlawful accumulation, directed or involved, in the provisions of the will. INGRAHAM, J. dissented.(*a*)

7. That the whole will was valid, except the first of the alternative limitations over of the widow's annuity fund, in the 21st article, and (with that exception) should be carried into effect, so far as related to any objections made to it on those grounds.

(*a*) INGRAHAM, J. dissented from so much of the decision in this case as holds that the bequest of the residuary personal estate is valid; holding that the direction to invest the personal estate and the proceeds of the real estate for the payment of legacies at ten years thereafter, or any future period, necessarily produced an accumulation for the benefit of persons not minors, and was therefore void.

Phelps *v.* Phelps.

The testator, by the 17th clause of his will, referred to a scheme on the part of the friends of African colonization, to erect and found a college in Liberia, Africa; and declared that if the enterprise should proceed and $100,000 should be raised for the purpose, in this country, then and in such case he gave to his executors the sum of $50,000, to be applied by them in such way as should in their judgment best effect the object; wishing his executors especially to have in view the establishment of a theological department in said college, to be under the supervision of the Union Theological Seminary in the city of New York. *Held* that this bequest was void; the object of the charity, the mode of applying it, and the time when it should take effect, being so uncertain and indefinite that the trust could not be enforced by the court.

Promissory notes, without consideration, given by a parent to his children, in his lifetime, cannot be enforced against his estate, after his death.

The payment of the interest on such notes, to the payees, by the maker, for two or three years before his death, will not make the notes valid against his estate.

A person can *give* goods, chattels or money, but not his own promises, so that they can be enforced.

APPEAL from a decree made at a special term, upon pleadings and proofs. The action was brought by the plaintiff, as sole acting executrix, against the children and heirs at law of Anson G. Phelps, sen. for a construction of his last will and testament. The will was executed on the 24th day of March, 1852, in due form of law to pass real estate, and the testator died November 30, 1853. The will, as set forth in the complaint, contained the following provisions: "*First.* I hereby nominate, constitute and appoint my beloved wife Olivia, my son-in-law William E. Dodge, and my son Anson G. Phelps, the executrix and executors of this my last will and testament, and I do hereby fully authorize and empower them, or such one, or more of them as may prove this my will, and the survivors and survivor of them, to sell and convert into money all my estate, real and personal, whatsoever and wheresoever, (except my present homestead and lands hereinafter devised to my wife,) and either at public or private sale, and upon such terms as they may think most conducive to the interests of my estate; and to make, execute and deliver, good and sufficient deeds and conveyances therefor to the purchasers

thereof. And in case my son-in-law William E. Dodge, and my son Anson G. Phelps, shall both die before my estate shall be finally settled, then from and immediately after the death of the survivor of them, I do then appoint my two grandsons Daniel W. James and William E. Dodge, junior, executors of this my last will and testament, with the like power and authority, in all respects, as herein above mentioned and given to my other executors. *Second.* I give and devise to my beloved wife, the dwelling house where we now reside, at the corner of the First avenue and Thirtieth street, in the city of New York, together with the lots of land connected with it on which it stands, on the west side of the First avenue, bounded easterly in front by said avenue, southerly by Thirtieth street, and northerly by Thirty-first street, and extending back westerly on Thirty-first street, to James Stokes' line, and extending on Thirtieth street, westerly to the brick stable, and including the stable and the ground on which it stands, to have and to hold the same to my said wife, her heirs and assigns, absolutely and forever. *Third.* I give and bequeath unto my beloved wife all my household goods, furniture, plate, books and family stores, and also all my horses, carriages, harnesses and other effects pertaining to my house and stables, absolutely and forever. *Fourth.* I give and bequeath to my beloved wife the sum of five thousand dollars annually during her natural life, and direct my executors to invest, as a separate fund, in such securities as they may judge most expedient, a sum sufficient to yield that amount annually, to be paid to her in semi-annual or quarterly payments, as may be most convenient. The provision herein made for my said wife is intended, and is so given to her, in lieu of all dower and thirds out of my estate. *Fifth.* I give and bequeath to my niece Lois Howell, widow of the Rev. Mr. Howell, one thousand dollars, to be paid in ten annual installments of one hundred dollars each. *Sixth.* I give and bequeath unto Eliza Phelps, wife of my nephew Peter Phelps, of Derby, the sum of one thousand dollars. *Seventh.* I give and bequeath to

each of my grandchildren living at the time of my death, ten thousand dollars, to be paid to them respectively, as they shall severally attain the age of twenty-one years. *Eighth.* I also give and bequeath to each of my grandchildren, living at my decease, the sum of five thousand dollars, to be paid to them as they severally attain the age of twenty-one years. This latter bequest I direct to be accompanied by my executors with this injunction, that each of my said grandchildren shall consider the said bequest as a sacred deposit, committed to their trust to be invested by each grandchild, and the income to be derived therefrom to be devoted to the spread of the gospel, and to promote the Redeemer's kingdom on earth, hoping and trusting that the God of Heaven will give to each of them that wisdom which is from above, and incline them to be faithful stewards, and transmit the same amount unimpaired to their descendants, to be sacredly devoted for the same objects. I know that this bequest is absolute, and places the amount so given beyond my control, but my earnest hope is that my wish may be regarded, as I leave it as an obligation binding simply upon their integrity and honor. *Ninth.* I give and bequeath unto each of my children, who shall be living at the end of ten years after my decease, the sum of one hundred thousand dollars, provided my son Anson G., or my son-in-law William E. Dodge, shall either of them then be living; but in case they both shall die before that time, then I give one hundred thousand dollars to each of my children, who shall be living at the decease of the survivor of them. *Tenth.* I give and bequeath to the 'American Bible Society,' formed in the city of New York in the year 1815, the sum of one hundred thousand dollars, to be applied to the charitable uses and purposes of the said society, and to be paid to the said society in ten annual installments of ten thousand dollars each—the first payment to be made in three years after my decease, and the like sum of ten thousand dollars annually thereafter, until the whole of said sum is paid. *Eleventh.* I give and bequeath to the 'American Board of Commissioners for Foreign Mis-

sions,' located in Boston, the sum of one hundred thousand dollars, to be applied to the charitable uses and purposes of said board, and to be paid in ten annual installments of ten thousand dollars each; the first payment to be made in five years after my decease, and the like sum of ten thousand dollars annually thereafter, until the whole sum is paid. *Twelfth.* I give and bequeath to my executors the sum of one hundred thousand dollars in trust, to pay over ten thousand dollars thereof in seven years after my decease, to the person who, when the same is payable, shall act as treasurer of the 'American Home Missionary Society,' formed in the city of New York in the year 1826, to be applied to the charitable uses and purposes of the said society, and in like manner to pay over the sum of ten thousand dollars annually thereafter, for such charitable uses and purposes, until the whole of the said sum is paid. *Thirteenth.* I give and bequeath unto the 'Union Theological Seminary,' located in the city of New York, the sum of five thousand dollars, to be paid over to the said seminary in ten annual installments of five hundred dollars each. *Fourteenth.* I give and bequeath to the 'Theological Seminary,' located in Auburn, in the county of Cayuga and state of New York, the sum of three thousand dollars, to be paid over to the said seminary in three annual installments of one thousand dollars each. *Fifteenth.* I give and bequeath to the 'New York Institution for the Blind,' the sum of five thousand dollars, and it is my wish that the same, as far as practicable, may be applied to the use and benefit of poor pupils not otherwise provided for. *Sixteenth.* I give and bequeath to the 'Half-Orphan Asylum,' located in the Sixth avenue of the city of New York, the children of which attend the Mercer street church, the sum of one thousand dollars, to be paid by annual installments of one hundred dollars each, until the whole of said sum be paid. And I give the like sum, payable at the same time and in the same manner, to the 'Colored Orphan Asylum,' located on the Fifth avenue, near the lower Croton reservoir, of which last named asylum my daughter.

Caroline is one of the managers. *Seventeenth.* It has been contemplated by the friends of African colonization, to erect and found a college. in Liberia, Africa, and it is understood that some incipient steps have been taken for that purpose by its friends in Boston, Massachusetts. Now, in case the enterprise, which I consider an important one, shall proceed, and one hundred thousand dollars shall be raised for that purpose in this country, then and in such case, I give to my executors the sum of fifty thousand dollars, to be applied by them in such way as shall in their judgment best effect the object; and I wish my executors especially to have in view the establishment of a theological department in said college, to be under the supervision of the Union Theological Seminary in the city of New York. *Eighteenth.* I give and bequeath unto my executors the sum of one thousand dollars, in trust, to pay over the same to the persons who, at my decease, shall be the deacons of the Congregational Church of my native place, in Simsbury, Connecticut, in the district of Hop Meadow, of which the Rev. Mr. McLain was pastor for many years; and my desire is to have the same invested, if it can be legally done, by the deacons of said church, for the time being, for the benefit of the poor of the town, and the interest only applied to their use: but if there be legal difficulties in the way of attaining this object, then I direct the same to be paid over to the said deacons, and applied by them, in their own discretion, for the benefit of the poor of said town, according to law. *Nineteenth.* I give and bequeath to my executors the sum of five thousand dollars, in trust, to pay over five hundred dollars thereof in one year after my decease, to the person who, when the same is payable, shall act as treasurer of the New York State Colonization Society, to be applied to the charitable uses and purposes of said society, and in like manner to pay over the sum of five hundred dollars annually thereafter, until the whole sum is paid. *Twentieth.* After paying and satisfying, or providing for the payment, of all the legacies and bequests herein above mentioned, in full, then as to all the rest,

residue and remainder of my estate, whatsoever and wheresoever the same may be, I give, devise and bequeath the same to my children and grandchildren as follows: I order and direct the same to be divided into as many shares as I shall have children and grandchildren living at the end of ten years after my decease, provided that my son Anson G. Phelps, or my son-in-law William E. Dodge, shall either of them be living at that time. But if, before the expiration of ten years from my death, my son Anson G. Phelps and my son-in-law William E. Dodge shall both happen to die, then at the decease of the survivor of them, I order and direct my said residuary estate to be divided into as many shares as I shall have children and grandchildren living at the time of the decease of such survivor, it being my intention that each child and grandchild shall be placed upon an equal footing, as to the said residue, and each child and grandchild receive one equal share of my residuary estate, upon such division as aforesaid, as soon thereafter as can conveniently be done. *Twenty-first.* In case my dear wife shall die before a division of my residuary estate takes place, as provided for in the last preceding clause of this my will, then and in such case the fund reserved by my executors, to secure her annuity of five thousand dollars, will fall into the bulk of my estate, and form a part of such residue; but in case the life of my dear wife shall be spared beyond that period, then it is my will that the fund or principal sums invested to secure such annuity, shall, at her decease, be divided into as many shares as I shall have children and grandchildren living at her decease, and that each then living child and grandchild of mine, in respect to said fund, shall stand upon an equal footing, and each one receive one equal share thereof. *Lastly.* I do hereby fully authorize and empower my executors to compromise, compound, adjust and settle all claims and demands due to me, or to become due to me, and all difficulties and differences that may arise relating to my estate."

The complaint alleged that the said Anson G. Phelps, after

Phelps *v.* Phelps.

the making and publishing of his said will, and on or about the 30th day of November, 1853, departed this life, at the city of New York, leaving the said will in full force and effect, uncanceled and unrevoked, and leaving him surviving his widow, the plaintiff in this action, his son Anson G. Phelps, junior, his daughters Melissa P., the wife of William E. Dodge, Caroline P., the wife of James Stokes, Harriet N., the wife of Charles F. Pond, and Olivia P., the wife of Benjamin B. Atterbury, his three grandchildren Daniel W. James, Elizabeth E. James, and Olivia P. James, children of his deceased daughter Elizabeth James, his only heirs at law surviving him.

That he also left surviving him, nineteen other grandchildren; and that since the death of the said testator, two other grandchildren had been born, to wit: Anson G. P. Atterbury, a child of his said daughter Olivia P. Atterbury, and Caroline Stokes, a child of his said daughter Caroline P. Stokes. That all the grandchildren of the said testator, excepting the said Daniel W. James, Elizabeth E. James, and William E. Dodge, junior, were minors, under the age of 21 years, and that they all resided in the city of New York, excepting two children of the testator's deceased daughter Elizabeth, viz: Elizabeth E. James and Olivia P. James, who reside with their father at Liverpool, in England, and the children of the testator's daughter Harriet N., who reside with their father and mother at Hartford, in the state of Connecticut. That at the time of the making of the will of the testator, and at the time of his death, he was seised and possessed of a large real and personal estate, most of which was situated in the state of New York where he resided, and was domiciled at the time of his death. But he died seised also of considerable real estate in the states of Connecticut, Pennsylvania, Indiana and Missouri. That some of the real estate in the state of New York, and some of that situated in other states, was subject to the lien of mortgages thereon, executed by the testator or by others from whom he had derived his title, and he was personally liable for the payment of the debts secured by most if not all of such

bonds and mortgages; and that by the laws of the states where the real property of the testator is situated, his personal property in the hands of the plaintiff is the primary fund for the payment of the mortgages for the payment of which he was personally liable. That on the first day of October, 1845, the said Anson G. Phelps gave to his daughter Melissa, the wife of William E. Dodge, a promissory note in the words and figures following, to wit:

"New York, October 1st, 1845.

"Five years after date, for value received, I promise to pay Melissa Dodge fifteen hundred dollars, with one hundred dollars interest, on the first day of January, in each year.

ANSON G. PHELPS."

That he continued to pay her the annual interest of $100, specified in that note, yearly, and every year down to the time of his death; but he died without having paid her the principal sum of $1500 mentioned in that note, or any part thereof, and the same, with the interest thereon from the first of October, 1853, still remains unpaid and wholly unsatisfied. That on the said first day of October, 1845, the said Anson G. Phelps gave also to each of his other daughters, viz: Caroline P. wife of the said James Stokes, and Harriet N. wife of the said Charles F. Pond, a promissory note bearing the same date and of the same amount and to the same tenor and effect, as the above mentioned note to his said daughter Melissa. That he continued to pay to each of them the interest on said notes annually to the time of his death, but died without having paid the principal sums, or any part thereof, and the same, with the interest thereon from the first October, 1853, still remain wholly unpaid and unsatisfied. That after the making of the aforesaid will, and a few days before the death of the testator, he gave to his son, Anson G. Phelps, junior, a promissory note for $100,000 in the words and figures following, to wit:

"New York, November 25th, 1853.

"My dearest beloved son, Anson G. Phelps, junior—I have long had a desire to place something in your hands to be used

prudently after my decease. I herewith inclose you my note for $100,000, payable to you, or your order, five years after the first January, 1854, to be used by expending the interest annually, but reserving the principal, the interest of which shall be devoted wholly to the spreading of the everlasting gospel, to be retained in my son's hands until near the close of his life, then to be well invested by him, or his executors, one-half of the principal for the benefit of the American Bible Society, of which Joseph Hyde is now the general agent; the other half of the principal to be in like manner invested by him, or his executors, for the benefit of the American Board of Commissioners for Foreign Missions, at Boston, of which Henry Hill is now treasurer. In accordance with the inclosed proposition, I herewith inclose my note, viz: dated January 1, 1854. I, for value received, hereby promise to pay to Anson G. Phelps, junior, or order, $100,000.

(Signed,)    Anson G. Phelps.

Witness—Harriet N. Pond.

Olivia Phelps."

This note, testamentary paper, or instrument in writing, was duly signed, published and declared by him in the presence of the two witnesses, who subscribed their names thereto as such witnesses, and at his request. That, in the states of Connecticut, Pennsylvania, Indiana and Missouri, where portions of the real estate of the testator were situated, the time during which the absolute ownership of such estates may be suspended by will is governed by the principles of the common law of England, and where the rents and profits of such real estate are not disposed of by the will of a testator during the continuance of such a suspension of the absolute ownership and the power of alienation, no valid trust or direction for the accumulation of such rents and profits is created in or by the will, such rents and profits belong to those who would have been entitled to such real estate by descent, if such testator had died intestate, and in the same proportions. But that the law of primogeniture does not exist in either of those

states; the real estate of an intestate who dies seised thereof descending to all his children living at the time of his death, and to the descendants of those who have died leaving issue, equally, *per stirpes*, the descendants of a deceased child taking the share which such deceased child would have taken if living at the death of the intestate. That at the time of the death of the said Anson G. Phelps he was a copartner in the firm of Phelps, Dodge & Co., which firm consisted of himself, his son Anson G. Phelps, jun., and his sons-in-law William E. Dodge, Daniel James and James Stokes. That the partnership property of the said firm consisted both of real and personal property; the legal title to which real property had been vested in all of the said copartners, in fee, as joint tenants, and not as tenants in common, for the sole purpose of giving to the surviving members of the firm upon the death of any of them, the legal title and power of selling for the benefit of all the copartners and their representatives. And that the plaintiff, after she had taken out letters testamentary, and assumed the execution of the will of her deceased husband, sold to the surviving copartners of the said firm of Phelps, Dodge & Co., all her right and interest as the executrix of the said Anson G. Phelps, deceased, in the real and personal estate of the said firm or copartnership, being thirty per cent of the capital stock, property and effects of the copartnership, which was the amount of the testator's interest therein (the remaining seventy per cent thereof belonging to the other surviving copartners,) for the price or sum of $689,569.83 which was the full value of the testator's beneficial interest in the real and personal estate of the said firm or copartnership, at his death, and at the time of such sale. That subsequently to the death of the testator, his widow and his daughters, together with the husbands of his daughters Melissa P. Dodge, Olivia P. Atterbury and Caroline P. Stokes, executed under their hands and seals, and delivered to his son Anson G. Phelps, jun., a written agreement or covenant, in the words and figures following, to wit:

Phelps *v.* Phelps.

"New York, 14th December, 1853.

Whereas, the late Anson G. Phelps, on or about the twenty-fifth day of November last, executed a note to his son Anson G. Phelps, jun., for the sum of one hundred thousand dollars, to be paid in five years from the first of January, 1854, which note is now held by the said Anson G. Phelps, jun. ; Now, we the undersigned, heirs and next of kin to the said decedent, knowing the intentions of the said decedent, and to relieve the executors of the will from any possible objections to the payment of said note, do hereby acknowledge its legality and validity, and do for ourselves and our respective heirs, executors and administrators, consent and agree that the said executors shall and may ·pay the said note in due course of administration of said estate." That the plaintiff, as the widow of the testator, and subsequent to his death, and within one year thereafter, elected to take the provision made for her in his will in lieu of her dower in his real estate, and that she had sold certain portions of his real property under the power in trust contained in said will, and for prices which she deemed sufficient, and which sales she believed were proper and beneficial to the testator's estate. That the personal estate of the testator, and the income thereof, would probably be more than sufficient to pay and discharge all the valid legacies given by the will, except the residuary bequest to such of testator's children and grandchildren as should be living at the time appointed in such will for the general distribution of the testator's residuary estate, and to pay and discharge the expenses of administration, and all the testator's debts, except those which by law are primarily chargeable on the real estate of which the testator died seised. That the American Bible Society, mentioned in the tenth section of the will, and in the said letter, testamentary paper, or instrument of the 25th November, 1853, was and is a body corporate, duly incorporated by or under an act of the legislature of the state of New York, by the name of "The American Bible Society." That the American Board of

Commissioners of Foreign Missions, mentioned in the eleventh section of said will, and in the said letter, testamentary paper, or instrument in writing of the 25th of November, 1853, was and is a body corporate, duly incorporated by or under an act of the legislature of the commonwealth of Massachusetts, by the name of "The American Board of Commissioners for Foreign Missions." That the American Home Missionary Society, mentioned in the twelfth section of the will, is not a body corporate, but an association of persons associated by or under the name of "The American Home Missionary Society" for religious purposes, and especially for the purpose of sending the gospel to remote and destitute portions of the United States of America, and that Jasper Corning, of the city of New York, was, at the death of the testator, and still is, the treasurer of the said association. That the Union Theological Seminary, mentioned in the thirteenth and seventeenth sections of the will, was and is a body corporate, duly incorporated by or under an act of the legislature of the state of New York, by the name of "The Union Theological Seminary in the city of New York." That the Theological Seminary located in Auburn, mentioned in the fourteenth section of the will, was and is a body corporate, duly incorporated by or under an act of the legislature of the state of New York, by the name of "The Trustees of the Theological Seminary of Auburn, in the state of New York." That the New York Institution for the Blind, mentioned in the fifteenth section of the will, was and is a body corporate, duly incorporated by or under an act of the legislature of the state of New York, by the name of "The New York Institution for the Blind." That the Half Orphan Asylum, mentioned in the sixteenth section of the will, was and is a body corporate, duly incorporated by or under an act of the legislature of the state of New York, by the name of "The Society for the relief of half orphans and destitute children in the city of New York." That the Colored Orphan Asylum, mentioned in the sixteenth section of said will, was and is a body

corporate, duly incorporated by or under an act of the legis-
lature of the state of New York, by the name of "The As-
sociation for the benefit of colored orphans in the city of
New York." That at the time of the testator's death, the
deacons of the Congregational Church in Simsbury, Connec-
ticut, in the district of Hop Meadow, mentioned in the 18th
section of said will, were Jury Wilcox and A. Case. That
the New York State Colonization Society, mentioned in the
19th section of said will, is not a body corporate, but an asso-
ciation of persons associated by or under the name of "The
New York State Colonization Society," for the benevolent pur-
pose of colonizing, on the coast of Africa, free people of color,
with their own consent, and that Nathaniel Hayden is at
present the treasurer of the said New York State Colonization
Society, and was such treasurer at the death of the testator.
The complaint further showed, that since the death of the
testator, various questions had arisen relative to the construc-
tion and validity and legal effect of many of the devises, be-
quests, trusts, and powers in trust, in said will contained,
made or created, or attempted to be created; and as to the
validity of the said several notes, given by the said testator to
his daughters, and as to the validity, construction and legal
effect of the note and letter, testamentary paper or instrument
in writing, of November 25th, 1853, hereinbefore set forth;
which questions were particularly specified in the complaint.

The complaint further showed, that Charles M. Pond, an
infant, one of the grandchildren of the testator, now presump-
tively entitled to a share in the division of the testator's gen-
eral residuary estate under the 20th section of the will, if the
residuary devise and bequest contained in that section is valid,
had, by John G. Vose, his guardian, lately commenced an ac-
tion against the plaintiff as such executrix, and others, in
which action it was, among other things, stated and insisted
in substance, that some of the legacies and bequests in the
said will are invalid, but without specifying which of them
are so invalid; that receivers had been appointed in that suit

of all the rents, income, proceeds and profits of all the real estate within this state whereof the said Anson G. Phelps died seised and possessed remaining unsold, except the homestead, which was specifically devised to his widow, and is now in her possession, and of the interest and income arising from the proceeds of the real estate which had been sold and disposed of under the power in trust contained in the will, with the usual powers and duties of receivers in like cases; and the said suit was still pending and undetermined. The plaintiff was therefore advised that she could not, with safety to herself and to the rights and interests of others, proceed and complete the execution of her trust as executrix of the said will, without the aid and protection of this court in giving a judicial construction to the several provisions of the will and of the said notes, letters and papers, so far as questions have arisen or may arise thereon. She claimed that all the legacies, bequests and devises in the will were valid, and that the said several notes to the testator's daughters, and the note and letter, testamentary paper, or instrument in writing, given by the testator to his son, were also valid, and that all the said notes ought to be paid out of the testator's personal estate; and she prayed that this court would, by its decision, decree or judgment, decide and declare the proper construction of the will, and other matters in reference to which such questions had arisen, and give proper directions in reference thereto, and so as to enable her to execute her trust properly and with safety. And that proper accounts might be taken from time to time of the estate of the testator which had come or might come to her hands, and of her administration of the estate, and between her and the legatees, and the devisees, and the next of kin of the testator. And for general relief.

The defendant, Anson G. Phelps, jun., put in an answer admitting most of the facts stated in the complaint; insisting upon the validity of the note, testamentary paper, or instrument in writing for $100,000, given to him by the testator; and joining in the prayer of the plaintiff, for a judicial con-

struction of the will. Separate answers were put in by the other defendants, submitting their rights to the protection of the court. The action was brought to a hearing, upon the pleadings and proofs, at a special term held by Justice CLERKE; who subsequently made the decree appealed from.

*Marshall S. Bidwell*, for the respondent Olivia Phelps, and the appellant Anson G. Phelps.

*B. F. Butler*, for the infant defendants Olivia P. James &c. and for Mrs. James.

*M. Porter*, for the appellants Pond and wife.

*E. H. Owen*, for the infant defendants, Chas. M. Pond &c.

*Wright & Merrihew*, for the appellants B. R. Atterbury and wife.

*Charles Edwards*, for the infant defendants, the Atterburys.

SUTHERLAND, J. This case calls for the construction of the will of Anson G. Phelps, sen., deceased, late merchant of the city of New York; who died on the 30th November, 1853, leaving a widow and five children, Anson G. Phelps, jun. Mrs. Dodge, Mrs. Pond, Mrs. Stokes, Mrs. Atterbury, and twenty-two grandchildren, him surviving. Three of these grandchildren were children of a deceased daughter, Mrs. James; the other grandchildren were children of the four daughters before named. After the testator's death, and before the commencement of this action, two more grandchildren were born. All the grandchildren, excepting three, were minors when the action was commenced. The testator died seised and possessed of real and personal estate of the value of about two millions, exclusive of the homestead devised to his widow; his real estate, exclusive of the homestead, having been valued at

$1,069,650, subject to mortgages to about the amount of $254,000; and his personal property inventoried at $999,-867.19.    The greater part of the real estate was in the city of New York; the remainder in Connecticut, Pennsylvania, Indiana and Missouri.    In addition to bonds and mortgages, to the amount of about $254,000, all executed by himself, the testator was individually indebted at the time of his death, exclusive of the notes to his children, to about the amount of $47,000.    The net annual rent of his real estate, in the city of New York, was about $24,500, and in Connecticut $9,500; total $34,000.    The testator by his will, which is dated the 24th March, 1852, appointed his wife executrix, and his son Anson G. and his son-in-law William E. Dodge executors. The executrix has alone qualified; the executors have neither qualified nor renounced.    The executrix has sold to the survivors of the firm of Phelps, Dodge & Co., of which firm the testator was a member at the time of his death, all the interest of the testator in the assets of the firm for $689,569.83.    The partnership property consisted both of real and personal property; the legal title to which property had been vested in all of the copartners in fee as joint tenants, and not as tenants in common, for the sole purpose of giving to the surviving members of the firm, upon the death of any of them, the legal title and power of selling for the benefit of all the copartners and their representatives.    The executrix has, under the will, sold other portions of the real estate, and was continuing to do so until restrained by injunction.    The widow has elected to take the provisions made for her in the will in lieu of dower.    To provide for her annuity of $5,000, she has, as executrix, set apart bonds and mortgages and other securities to the amount of $104,100, and yielding an annual interest of $7,325.50. These bonds and mortgages, &c., are in her own hands.    Some portion of the $254,000 of mortgages was on real estate not in this state.

In construing this will, the first question is whether the real estate of the testator is to be considered as converted into

money under the power of sale contained in the will. In the first section of the will, immediately after appointing his executrix and executors, the testator says: "And I do hereby fully authorize and empower them, (the executrix and executors,) or *such one* or more of them as may prove this my will, and the survivors and survivor of them, to sell and convert into money all my estate, real and personal, whatsoever and wheresoever, (except my present homestead and lands hereinafter devised to my wife,) and either at public or private sale, and upon such terms as they may think most conducive to the interest of my estate; and to make, execute and deliver good and sufficient deeds and conveyances therefor to the purchasers thereof." The power of sale and of conveyance, it is seen, is as full as it well could be drawn. This power is given, before any devise or bequest is made, and appears to have been the first thing thought of after the appointment of his executrix and executors.

I think that in construing and giving effect to the will this power must be considered as having been exercised, and the real estate all converted into money. From the whole will it appears to have been the intention of the testator to have this done. The most important purposes and provisions of the will appear to me to call for this conversion. Indeed, I do not see how the evident intention of the testator as to the final disposition of his residuary estate, the payment of the contingent legacies, and even the payment of some of the vested legacies, can be carried out without it. There is no express direction in the will to sell; but as the execution of the power to sell is not made expressly to depend on the will of the executors, it is therefore imperative. (1 *R. S.* 734, § 96.) After the devise of the homestead to his wife, in the second article of the will, the word devise is not found until we come to the residuary clause. The testator died seised of real estate, exclusive of the homestead, worth a million; and yet there is not a specific devise in the whole will of any part of it, and not a word referring to it as distinguished from the personal,

in the whole will, except in the first article, in giving the executors the power of sale, and in the residuary clause, where the word devise is used. In the third article, after the devise and bequest of the homestead, and household furniture, plate, books, &c., to his wife, the testator by the fourth article gives to his wife an annuity of $5000, and directs his executors "to invest, as a *separate fund*, in such securites as they may judge most expedient, a sum sufficient to yield that amount annually," &c. There is no other separate investment of any other part or portion of the estate directed, but the whole residue and bulk of the estate, real and personal, with the rents, issues and income thereof, in the absence of any express devise to the executors, or to any one else, is left to go, until, and as the legacies are paid, or provision is made for their payment as the will directs, and until the residuary clause takes effect by the vesting of the residuary estate absolutely in possession in the residuary devisees or legatees, under it, where the law, or reasonable implications of the intention and purposes of the testator, derived from the several express provisions of the will, and its general scope and scheme, will carry it. Now, by law the personal property goes to the executors without any express direction; but where did his real estate with its rents, issues and profits go on the testator's death? Who was to have the possession and use of the same until the legacies were paid or provided for by the executors, and until the residuary estate should vest absolutely in possession under the will? From the express provisions, what are we to infer was the testator's intention in relation thereto? After separating and setting aside the fund for the use of his wife, for life, and after giving away, absolutely or contingently, out of the remainder and bulk of his estate, $1,200,000 in legacies, the residuary clause is, "*after paying and satisfying*, or *providing for the payment*, of all the legacies and bequests hereinabove mentioned, in full, *then* as to *all the rest, residue and remainder* of my estate whatsoever and wheresoever the same may be, I give, devise and bequeath the same to my children and grand-

children, as follows : I order and direct the same to be divided into as many shares as *I shall have* children and grandchildren living at the *end of ten years* after my decease, *provided* that my son Anson G. Phelps, and my son-in-law Wm. E. Dodge, shall either of them be living at that time. But if before the expiration of ten years from my death, my son Anson G. Phelps and my son-in-law Wm. E. Dodge, shall *both* happen to die, then at the decease of the survivor of *them* I order and direct my residuary estate to be divided into as many shares as I shall have children and grandchildren *living* at the time of the decease of such survivor, it being my intention that each child and grandchild receive one equal share of my residuary estate upon such division as aforesaid, as soon thereafter as can conveniently be done."

Now it is very clear, that the testator intended to dispose of *all* his estate by his will ; he does expressly devise and bequeath it *all*—the *residue, after* the payment or provision for the payment of *all* the legacies, and *subject* to such payment or provision. The postponement of the residuary devise and bequest until after the payment or provision for the payment of all the legacies ; the contingency as to the time of the division of the residue among the children and grandchildren *then* living ; the division itself by the executors ; the careful postponement of the payment of the large vested, absolute legacies to the religious and charitable corporations and societies ; their payment in annual installments ; the postponement of the payment of the vested legacies to the grandchildren, of $15,000 each, in the seventh and eighth articles of the will, until they severally arrive at the age of twenty-one ; the fact that the vesting of the contingent executory legacies of $100,000 to each of his children in the ninth article, is made to depend as to the time of their vesting absolutely, upon the same contingency, as the time of the division of the residuary estate among the children and grandchildren ; the fact that this contingency might occur within a month or ten days after the testator's death, and if so, that *then* the $1,200,000, given in legacies, must be paid, or the payment of them provided for

by the executors out of the personal property, diminished by the fund set apart for the widow, and the simple contract debts of the testator, and out of the real estate, diminished by the $250,000 of mortgages; and that *then*, also, the residue of the whole estate must be divided by the executors among the children and grandchildren; the fact that the residuary clause does *not* vest the residuary estate in the children and grandchildren *living at the testator's death*, on his death, (as I shall presently show,) but that the devise and bequest in that clause is executory, and by it the residuary estate cannot vest, until the end of ten years from the testator's death, unless the life nominees, Anson G. Phelps, jun. and William E. Dodge, *both* die sooner; all these facts and circumstances show—the whole scheme of the will shows—that the testator did not intend that his real estate should go to his heirs at law, with its rents and profits, subject to be divested at the end of ten years, or on the death of the life nominees, if they die before, in favor of the residuary devisees; but that he intended his whole estate, real, with its rents and profits, or its proceeds, as well as personal, except the homestead, furniture &c., specifically devised to his wife, to go into the hands of his executors; and that they, after investing *separately* out of the same the fund for the widow's annuity, and paying out of the same the trifling amount of legacies payable immediately, and the testator's debts, should hold the residue in bulk, in trust, to pay or provide for the payment of the contingent and postponed legacies, and to make the division of the final residue under the residuary clause. As the expectant estates and interests of the children and grandchildren in the residuary estate, created by the residuary clause, cannot properly be called *limitations*, on a previous term, nor even *limitations* without a previous term, of *any particular parcel of real estate or fund*, but are executory devises and bequests of an undefined residue of the bulk of the estate to be kept together by the executors in trust until the residuary clause takes effect; and *then*, (the bulk of the estate, and not the residue,) to be divided, and

one part of it taken by the executors to pay or to *provide* for the payment of *all* the legacies, and the other part and residue to be divided by the executors, at the *same* precise time, among the children and grandchildren under the residuary clause ; the whole trust closing when this division of the bulk of the estate, and of the residue among the children and grandchildren takes place ; I think the provision of the revised statutes, (1 *R. S.* 726, § 40,) that " When, in consequence of a valid *limitation* of an expectant estate, there shall be a suspense of the power of alienation, or of the ownership, during the continuance of which the rents and profits shall be undisposed of, and no valid direction for their accumulation is given, such rents and profits shall belong to the persons presumptively entitled to the next eventual estate," has no application here ; even admitting these expectant estates to be *valid*, and the suspense of the power of alienation to arise from the creation of these expectant estates, and not from the trust ; and that this section applies to contingent future estates as well as to vested future estates.   Now, as it is very clear, from the whole will, that the testator intended his executors to take his whole estate, real, as well as personal, and the rents and income thereof ; and as it is very natural and reasonable, and the testator probably intended, that, taking it, they should first apply the rents and income to the payment of the legacies, and thus increase the dividend of the residuary estate ; and as an express devise to the executors, of the *real* estate, to receive the rents, issues and profits thereof in *trust*, to apply the same towards the payment of the legacies would have been illegal, and the trust void ; (*Hawley* v. *James*, 16 *Wend.* 61, 144, *opinion of Bronson, J.;*) and as there is a full express power in the will to the executors to sell and convey all his real estate ; I think the will of the testator should be carried out and executed in all its parts, if it can be, by considering the power of sale exercised, and the real estate of the testator converted into money.   It is the duty of the court to consider the real estate of the testator converted immediately into money,

under the full power of sale, if by so doing the will can be carried into effect. (*Van Vechten* v. *Van Veghten*, 8 *Paige*, 104. *Haxtun* v. *Corse*, 2 *Barb. Ch.* 519.) The conversion of the whole real estate into money involves the payment or disposition of the $250,000 of mortgages.

Looking, then, upon the real estate as converted into money, and the money in the hands of the executor, in trust, for the purposes of the will, the *second* question is, whether the effecting these purposes *may* involve the unlawful suspension of the power of the absolute disposition of this money, or of any part of it; or *necessarily* involves an unlawful accumulation of its interest, or of any part of it? In the examination of this question the first thing to be looked at is the residuary clause, as furnishing the key to the whole will. Is the devise and bequest by the residuary clause a devise and bequest of the residue to the children and grandchildren *living at the death of the testator* absolutely; giving them a vested estate and interest in the residue on his death, liable to be divested in favor of the survivors as they severally might die before the time for the actual division of the residue, and to open and let in after-born grandchildren; or is the devise and bequest to such of the testator's children and grandchildren living at his death or born afterwards *as shall be living at the end of ten years*, or at the death *of the survivor of the two life nominees* if they both should die before the expiration of the ten years? Is the expectant estate or interest of the testator's children and grandchildren now living, in the residuary estate, vested; or is it *contingent*, depending for its vesting upon their living until the end of ten years, or until the event happens upon which the residue is to be divided sooner? And here let me remark, that if this expectant estate were limited as a remainder, the question would be precisely the same whether you call the whole residue money or land. Previous to the revised statutes money as well as any other chattel could be limited over after a term, by way of remainder, (2 *Kent*, 5th ed. 352 353; *Moffat* v. *Strong*, 10 *John.* 12;

*Westcott* v. *Cady, 5 John. Ch.* 334,) and by the revised statutes, (1 *R. S.* 773, § 2,) "limitations of future or contingent interests in personal property, are made subject to the rules prescribed therein, in relation to future estates in lands." Now I concede, that if the future interests in the residuary estate created by the residuary clause were interests in a particular fund, which had been previously set apart, and the use of it previously given for a particular term, like the widow's fund for life, then these interests might be considered limited as remainders; and then they might be vested; certainly the liability to be divested by death, in favor of the survivors, and to open and let in after-born grandchildren, would not have prevented their vesting on the death of the testator, in the children and grandchildren then living. The liability to defeasance by condition subsequent cannot prevent an estate from vesting. Such defeasance and consequent revesting in some other, *is an alienation.* But as the residuary bequest in this case, looking upon the whole estate as converted into money, is a bequest of an indefinite residue of the bulk of the estate, previously and up to the very instant of the bequest taking effect, kept together in trust, without any previously limited term or use of such residue as a *distinct separate fund*, such bequest cannot be considered, and cannot take effect, as a remainder.

The simple question, then, is as to the intention of the testator;—did he intend to give the residuary estate to his children and grandchildren living at the time of his death, absolutely, subject to be divested &c., *to be paid* at the end of ten years, or sooner, if the life nominees both died before; or did he intend to give it only to such children and grandchildren as should be living when the residue should be divided? I think the latter; and that, consequently, the legacies are executory and contingent.

The legacy of $100,000 to each of his children in the ninth article, is clearly contingent. The *bequest* is, unto each of my children *who shall be living* at the end of ten years, &c. Then

three legacies of $100,000 each are given to three religious societies or corporations, payable severally in ten annual installments of $10,000 each, the first installments payable three, five and seven years after the testator's death; thus postponing the payment of the last installments thirteen, fifteen and seventeen years. Now, the words of the residuary clause are: "*After* paying and satisfying or providing for the payment of all the legacies and bequests hereinabove mentioned, in full, then as to the residue &c., I give, devise and bequeath the same to my children and grandchildren as follows," &c. The devise and bequest by its very terms is not a *present* but a *future* devise and bequest. It is not a devise and bequest of the residue, after paying &c., the before mentioned legacies; but after paying them &c., a devise &c., of the residue. But how is the residue to be divided, and between what children and grandchildren? The will is, "I order and direct the same to be divided into as many shares as I shall have children and grandchildren *living at the end of ten years.*" The bequest of the legacies of $100,000 each in the ninth article, is not to each of his children, but to each of his children *who shall be living at the end of ten years after his decease,* &c. Although there are words of present gift, yet the objects of the gift cannot be ascertained until the end of ten years, or the event happen upon which these legacies and the residuary bequests are all to be paid, or their payment provided for, sooner, and at the same time. Although in the residuary clause there are words of present gift in addition to the direction to *divide*, yet I think the testator intended to give to such children and grandchildren as should be living at the time the division of the residue should take place.

If there was any direction in the will that the income or interest of a portion of the estate should be paid to or applied or accumulated for the benefit of, the children and grandchildren of the testator, living at the time of his death, until the legacies in the ninth article should be paid, and the residuary estate should be divided, that would be a circumstance to

show that he intended to give to his children and grandchildren living at his death, absolutely. (2 *Williams' Ex'rs,* 1059, 1061, 1066, 7, *and cases there cited.*) The law favors the vesting of legacies, but the law cannot vest them against the words and plain intention of the testator.

The vesting of the residuary interests, and of the legacies given by the ninth article, is contingent. This contingency and the provision to be made for the payment of the postponed vested legacies, calls for the trust, and the trust supports the contingent legacies and the contingent future residuary interests. Now it is plain, that between the two, the trust and this contingency, there is a suspension of the power of the absolute disposition of the bulk of the estate, and that there was intended to be. The testator intended the income of his estate to be applied to the payment of the installments of his charitable legacies, as they should fall due, and of the vested legacies given to his grandchildren, as they severally arrived at the age of twenty-one, and thus make his estate work in the hands of the trustees after his death, to increase the residuary dividend. The scheme involves the keeping of the bulk of the estate together, undisposed of, until the event or the time occurs, when the residuary estate is to be divided, the contingent legacies paid, the others provided for, and the trust closed. It is immaterial, whether the restraint upon alienation is caused by the contingent future interest, or the trust, or both. During the trust, and until these contingent future interests vest, the absolute disposition of a great part of the estate is suspended. The important question is whether this suspension is unlawful. It must cease during the continuance, or at the expiration of two lives, or it is unlawful. It is evident, that the suspension cannot continue longer in this case.

By the residuary clause, the residuary estate is to be divided by the executors among the children and grandchildren, on the death of the survivor of the two life nominees, if they *both* die before the expiration of ten years, or at the expiration of ten years. Of course, this division must take place, either at the

expiration of the two lives, or within the continuance of at least one of the lives. If the division is postponed ten years, *one of the lives must be living;* if the division takes place sooner, it must be at the expiration of the *surviving* life. I do not see that it makes any difference that Anson G. Phelps, jun., one of the life nominees, is also one of the expectant residuary legatees. By the statute, the life nominees may or may not be irrespective of the estate. It is true, all his sisters and all the grandchildren might die before the expiration of the ten years, leaving him the expectant of the whole residuary estate; but if he lived to the end of the ten years, it would vest absolutely in him, and, if he died before, it would vest absolutely under the statute of distributions or of descents; and so, in any event, the residuary estate must vest absolutely and the trust close, at the expiration of the two lives, or during the continuance of one of them.

It follows, that no direction or provision of the will is void as involving an illegal restraint of the absolute alienation of any part of the estate, unless it is the bequest over of the widow's fund on her death, by the 21st article. This fund cannot fall into the bulk of the estate and form a portion of the residue, if the widow dies before the division of the residue; for then its absolute alienation might be suspended for three lives. If the widow should die before either of the residuary life nominees, and her fund should fall into the bulk of the estate and be divided before the end of the ten years on the death of the survivor of the life nominees, under the residuary clause, the alienation of the fund would have been suspended for three lives. But I do not see why the limitation over of this fund to the children and grandchildren living at the decease of the widow in case she dies *after the division of the residue,* is not valid. This limitation is contingent and may never take effect; but if it does take effect the alienation cannot thereby be suspended longer than one life; it must take effect absolutely on her death. Reject the first limitation over of the fund in case of her death before the division of the

residue as unlawful, and you have a second good limitation over, nowise affected by the first.

On the death of the widow, therefore, this fund will go and vest absolutely either in the children and grandchildren under the second limitation in the 21st article; or it will go, as undisposed of by the testator, after the widow's death, to his next of kin, under the statute for the distribution of intestates' estates; but as in any event it cannot vest absolutely in possession either in the children and grandchildren under the second limitation of the 21st article, or in the next of kin as undisposed of, *until the widow's death;* she having a good life use of the whole of the fund; it is impossible that the widow has, or can ever have, any other right or interest in this fund, than her life use. It would certainly be very extraordinary, if the widow was entitled to a share of a remainder (for it is the remainder and not the reversion that is undisposed of absolutely) limited on her own life.

Having considered the objections to the will, founded on the supposed unlawful restraint of the right of absolute alienation, let us now consider the other principal objection, that it involves necessarily an unlawful accumulation of the interest, rents and income of the estate.

If the carrying out of the will requires an accumulation of the interest, &c., it must be unlawful, for such accumulation would not be for the benefit of minors exclusively; and the accumulation which might be lawful for the benefit of the minors exclusively, cannot be separated from the accumulation for the benefit of others, which would be unlawful. Now looking at the whole estate as converted into money, and in the hands of the executrix at the death of the testator; and after the payment of the debts and the small legacies payable immediately, at the residue as invested for the purposes of the will and its trusts; I know of no rule of law which would prevent the application of the interest and income first to the payment of the legacies as they should become payable; and if so applied, I cannot say from the pleadings and proofs in

this case, that there must be any accumulation. $300,000 of the estate has gone, or must go, to pay the debts of the testator; and the proofs do not disclose the ages of the twenty-two grandchildren, living at the testator's decease, who are each to have legacies to the amount of $15,000 paid to them as they arrive severally at the age of twenty-one. Who can say, how soon the whole trust will terminate, when all the legacies are to be paid or to be provided for, and the residuary estate is to be divided, by the death of the survivor of the two life nominees?

Whether the whole estate is to be considered as converted into money or not, I cannot say that there need be any accumulation. There is in the will no direction for an accumulation. If there was, that would be void. There being no direction for accumulation, the court must see that some provision or direction in the will necessarily involves an unlawful accumulation, before they can declare the will, or any part of it, void for that cause. I think there is no unlawful restraint upon alienation, nor any unlawful accumulation directed or involved, in the provisions of the will, and that the whole will is valid, (except the first of the alternative limitations over of the widow's fund in the 21st article as aforesaid,) and (with that exception) should be carried into effect, so far as any objections have been made to it by any of the parties on those grounds.

As to the religious and charitable legacies, I think they all come within *Owens* v. *The Missionary Society M. E. Church*, (14 *New York R.* 380,) and are valid; except the conditional one of $50,000 for erecting and founding a college in Liberia, Africa. All the other charitable legacies are given to corporations, capable of taking, or to trustees capable of administering the charities; and the charity, or object of the other charitable legacies is sufficiently plain and distinct. If the legacies given in the 12th, 18th and 19th articles of the will, should be considered as given to the treasurer of the "American Home Missionary Society," to the "Deacons of the Congregational

Church in Simsbury, Connecticut, &c.," to the acting "Treasurer of the New York Colonization Society," mentioned in those articles of the will respectively, in trust for the charitable uses and purposes in those articles severally specified, and not to the executors in trust, although formally so expressed, still I think the bequests valid; the charities being sufficiently definite, and the treasurer, deacons, &c., being persons easily ascertained and capable of taking. But the gift in the 17th article for the erection and founding of a college in Liberia is, I think, too indefinite to be enforced. What kind of a college did the testator mean? Religious, literary, or a college of physicians? As he wished his "executors to have in view the establishment of a theological department in said college, to be under the supervision of the Union Theological Seminary in the city of New York," perhaps he meant a literary or theological college. But how did he intend it to be under the supervision of the "Union Theological Seminary in the city of New York?" Did he mean his money to go to the erection of the building, or to "the establishment of a theological department?" Who were to be the trustees of the charitable use? The executors are only to *pay over* or *apply* the money in the first instance. It is true they are to apply it in their discretion, but the object of the charity, and the trustee, should be sufficiently certain to enable the court to decree the execution of the trust. How long are the executors to wait for the $100,000 to be raised by the friends of the college in Boston? All these things are indefinite; and, upon the whole, I think, the object of the charity, the mode of applying it, and the time it should take effect, so uncertain that the trust cannot be enforced by the court. And a charitable trust, the execution of which cannot be legally enforced, must be considered void.

I have noticed, I believe, all the questions raised in this case, involving the construction of the will or the validity of any of its legacies or provisions. The only remaining questions in the case are as to the validity of the notes, or papers

called notes, given by the testator in his lifetime to his son Anson, and to his daughters, Mrs. Dodge, Mrs. Stokes and Mrs. Pond. I do not see how any of them can be legally enforced against the estate. They were all gifts of mere promises of the testator, without consideration, in his lifetime, and I cannot see how they can be enforced against his estate after his death.

The letter of the testator to his son, which accompanied the gift of the note for $100,000, shows not only that it was a mere promise without consideration, but that the testator never intended it to have the force and character of a valid promissory note in his lifetime. *It was not delivered to be enforced against the testator, but against his estate.* To hold the note valid would be in effect to give the note the force and operation of a codicil to the will, properly executed according to the forms of law; and thus a mere naked promise made by the testator after his will would be made to operate as a revocation of the disposition by his will of one hundred thousand dollars of his estate. I do not see how the payment of the interest on the notes to the daughters, for two or three years before his death, can make the notes valid against his estate. The notes, as against the testator, were without consideration and void in the hands of the daughters. The payment of the interest conld not react and make the notes valid from their inception. One can *give* goods, chattels, money, but not his own promises so that they can be enforced. If there is a consideration for the promise, it is not a gift.

Let a decree be settled, on four days' notice, in accordance with the principles and directions stated in this opinion.

DAVIES, P. J., concurred.

INGRAHAM, J. The power to sell all the real estate was not necessarily to be executed, in order to carry into effect the subsequent provisions of the will. A sale of sufficient to pay all the bequests and legacies provided for, except those in the

20th clause, would have been sufficient to enable the executors to close up the estate after the expiration of the time embraced by the limitations therein. After these payments were made, the real estate would pass, under the devise in the 20th clause of the will, as fully as if the real estate had been converted into money under the power of the 1st article; or if that clause is not valid, it would vest in the heirs at law of the testator. And for the purpose of division into equal parts or shares, it would not be necessary that the same should be sold. The estate in the lands would vest in the devisees, or heirs, and it is apparent from the whole clause that the division into shares was merely to show the intent of the testator that his children and grandchildren then living should each receive an equal share of the residuary estate. The mere authority to sell all the real estate was not under any portion of the will obligatory upon the executors to sell, and even if the testator thought the power advisable for the more easy settlement of the estate, still it left to the executors the discretion of deciding whether they would sell, or not, the portion that would remain to be distributed under the residuary clause.

I feel much hesitation in adopting any view of this question which could be construed into an evasion of the provisions of law in regard to trusts. It must be conceded that a devise to the executors, of the real estate in trust to carry out the subsequent provisions of the will, would in many respects be illegal, as creating trusts not allowed by law. To hold that the executors could do under a power what they could not do under a devise of the real estate, would be a palpable evasion of these provisions; while the construction suggested—that this power to sell was given for the purpose of enabling the executors to pay the moneys to be paid from time to time under the will, and not necessarily requiring a sale of all the testator's real estate, so as to apply the rule which would convert it into personal property—would be no violation of law, and at the same time would leave the estate in the portion of the real estate un-

sold to vest in those to whom it was devised, or who inherited it. If the estate, real and personal, is to be considered as solely personal under the power to sell, then the difficulty arises under the other provisions, that the personal estate is directed to be held for accumulation for the benefit of other than minors; and the same difficulty exists as to the personal estate which is bequeathed by the 20th clause.

The will gives specific legacies, to be paid absolutely before the division of the residuary estate, to an amount exceeding one-half the real estate. The payment of those legacies depends upon contingencies which may postpone that payment for years, or which might happen in the case of some of them at any moment. The postponement of the payment of these legacies, and the distribution of the residue in any event, for ten years, clearly renders an accumulation necessary, and that accumulation necessarily operates for the benefit of those taking under the residuary clause. There are already in existence two grandchildren born after the death of the testator, and many of those who were in being at his death were not minors. If the accumulation had been specially directed, so as to make the amount larger for those entitled to the residue, it would have been illegal. Shall the testator be allowed by such an evasion to effect a result which the law forbids his doing directly?

The direction to pay the legacies does not limit such payments to be made out of the income. If the income is insufficient, they must be paid out of the principal of the estate. The delay in these payments, and the consequent delay of distribution of the residue, enables the executors, by the accumulation of interest, to increase the amount of the principal to be paid under the 20th clause of the will. If such a result could not have been directed by the testator in his will, surely the court ought not to sustain, as valid, provisions producing the same results, because the testator does not in words direct the accumulation.

The bequest to the widow, under the 4th article, of an an-

nual sum in lieu of dower is undoubtedly valid, and is not objected to by any of the defendants. But the provision in the 21st article, which disposes of the fund reserved for the ·payment of such annual sum, appears to me to be illegal, because it suspends such distribution for the period of three lives. The fund must be reserved during the life of the widow, and it cannot be divided under the 20th article before ten years, unless the son and son-in-law of the testator are also dead. It is said, "under other contingencies it might only be suspended for one life, viz., that of the widow, in case she outlived the other two lives." But still the two other lives on which the distribution was also made contingent, must have first terminated, and that termination was necessary before such distribution could be made, whether the widow outlived the son and son-in-law or not.

There can be no doubt that the absolute ownership of this fund may be suspended during the lives of more than two persons. It must be suspended during the life of Anson G. Phelps, jun., who has died before the widow, and it cannot be distributed during the life of Mr. Dodge, if he lives for ten years from the death of the testator. So far as the 21st article disposes of this fund in the contingency of the three lives, it is illegal and void.

The same difficulty applies to the provision in case the widow shall live beyond this period (of a division of the residuary fund.) This is equally dependent on three lives. The division of that fund is dependent on two lives. This condition applies to the division of the residuary estate which is contingent on two lives and the death of the widow. In any view that may be taken of the provisions of the 21st section, they are illegal and void, as suspending the absolute ownership of the fund for more than two lives.

I do not think the executors can properly anticipate the payment of the legacies. The whole scope and tenor of the will and the particular bequests, as well as the direction to provide a fund for their payment, all show that the testator

Phelps *v.* Phelps.

intended that the payments should not all be made at once. To the children and grandchildren they are made payable, either after ten years, or arriving at age; to the societies or other charities, they are payable at future periods, and in di-. vided amounts. It would not be a compliance with the will of the testator to have them paid at once; and when such clearly appears to have been his intention, courts should not defeat it by allowing such payments to be made in gross, and in anticipation.

As to the other points submitted to us, I concur in the conclusions to which Justice Sutherland has arrived.

The judgment of the special term is erroneous, in my judgment, in holding the 20th article of the will to be valid. It appears to me that the bequest and devise is void, so far as relates so the personal estate, inasmuch as the provisions of the will are such as to direct an accumulation for the benefit of persons not minors.

It is also erroneous in holding that the bequest of $50,000 for a college in Africa, is valid. Such bequest is void, for uncertainty as to the object of the testator.

It is also erroneous in holding that the widow was entitled . to one-third part of the fund reserved for her income.

It is also erroneous in holding that the executors may anticipate the payments of the legacies which the testator has made payable at future periods, and in divided amounts.

It is also erroneous in holding that the surplus income of the personal property should be paid over to the children and grandchildren. It would go to the children who were living, and the issue of such as are dead, and not to the grandchildren whose parent was living at the time it became payable.

[NEW YORK GENERAL TERM, September 20, 1858. *Davies, Sutherland* and *Ingraham,* Justices.]