## LEE et al. v. TOWER et al.

(*Supreme Court, General Term, Fourth Department.* November, 1890.)

**1. TESTAMENTARY CONVERSION—PERPETUITIES.**

Testator, after a partial provision for his wife in connection with his dwelling-house and property connected therewith, placed all the rest of his property in trust, the capital or principal to be held and preserved, the income to be distributed from time to time among the beneficiaries. The trustees were directed to invest the capital so as to make it as productive as reasonably could be; to preserve such investments as testator should leave standing in his name as long as they should deem it prudent; to make such new investments as they should deem advantageous, with full power to select any investments or securities they might approve, except capital stock of corporations and certain obligations; and to change investments and reinvest as they might think advantageous. Testator directed that royalties from coal or ore lands, and moneys received from any corporation or land association in which he had an interest; and out of dividends from any ore or mining company in

which he was interested, should be deemed capital of the estate; and that the trustees should not sell or dispose of his anthracite coal lands without the consent in writing of a majority of the beneficiaries then living and of age. He gave the trustees power to sell any of his real estate, except that the house and lot devised to his wife for life should not be sold without her assent, and that his request as to his coal lands should be observed. He requested that the books of the estate should be kept as he had kept them, and provided that his office building and lot, if not used by the trustees, might be rented or sold. He directed that, at the termination of the trust, the capital should be divided among all his lineal descendants then living. *Held*, that it could not be inferred that testator intended that the real estate should, at all events, be sold and converted into personalty, and there was, therefore, no equitable conversion; and the provisions of the will as to real estate, being repugnant to 4 Rev. St. N. Y. (8th Ed.) p. 2432, § 15, restricting the suspension of the absolute power of alienation to a period not longer than the continuance of two lives in being, were invalid as to real property within the state.

**2. DOWER—DEVISE IN LIEU—ACCEPTANCE—INVALID WILL.**

A widow accepted, in lieu of dower, the provisions of a will giving to her during her life two-fifths of the net income of the estate, which consisted of a large amount of real and personal property. In a suit by the heirs at law, the provisions of the will were held invalid as to part of the real estate, and it therefore descended to the heirs as if testator had died intestate. *Held*, that the widow was entitled to dower in such real estate.

Case submitted on agreed statement.

Submission of controversy without action, upon facts agreed on, by Deborah Taylor Lee and others, plaintiffs, against Charlemagne Tower, Jr., and others, executors of Charlemagne Tower, deceased, and others. On the 24th July, 1889, Charlemagne Tower, then being a resident of the city of Philadelphia, in the state of Pennsylvania, died, leaving a last will and testament made at Philadelphia, and dated May 21, 1889. This will was duly admitted to probate at Philadelphia, on the 31st July, 1889, and has been duly recorded in this state. At the time of his death, Tower was the owner of certain real estate in this state, consisting of ten parcels, nine of which are in the county of Oneida, and one in the city of Rochester, and the controversy here is over the construction of his will, so far as it may affect such real estate. In this will the testator, after providing for the payment of debts and funeral expenses, and giving to his wife absolutely his household goods, and horses and carriages, gave to her the occupancy and use of his residence in the city of Philadelphia, "to continue, if she so desire, during her natural life, and I direct that the taxes, water-rents, and repairs thereon, during her occupancy, to be paid out of the income of my estate. If, at any time, she shall desire to remove therefrom, she can take the rents, issues, and profits thereof, while she lives, or, with her consent, the same may be sold by my executors and trustees, under the power herein vested in them, and she shall receive the income of the proceeds during her life." Then, after naming his 10 lineal descendants, being 5 children and 5 grandchildren, he proceeds:

"I mention these names for the purpose of declaring my fixed intention and desire that the trusts, which are hereinafter declared, of my residuary estate, shall remain in full force, undetermined, and operative, as to the capital of all my residuary estate, until the period hereinafter appointed for the general division and distribution of the capital thereof, as declared in the fifth item of this my will.

"*Item 5.* All the rest, residue, and remainder of all my property and estate, whatsoever and wheresoever, real, personal, or mixed, I give, devise, and bequeath unto my son, Charlemagne Tower, Junior, my son-in-law, Richard Henry Lee, and Julius A. Bailey, (who, for many years, has been my trusted assistant and friend,) whom I hereby constitute and appoint the executors of this my last will and testament, and to their heirs, assigns, and successors in the trusts, hereinafter set forth; in trust, nevertheless, to take possession of, hold, manage, and appropriate the same, and to collect, receive, obtain, and recover all the rents, issues, profits, income, dividends, and gains thereof,

v.12 N.Y.s.no.3—16

and all the proceeds and avails thereof. and to invest and keep invested the same, and every part of the capital thereof, so as to make the same as productive as reasonably can be, and to keep proper accounts, as hereinafter more particularly directed in respect to the said trust property, and the proceeds, avails, and income therefrom, hereby directing them to preserve such investments and securities as I shall leave standing in my name, so long as they (my said trustees) or their successors in the trust shall deem prudent, and making such new investments as they, in their best judgment and discretion, shall deem advisable and advantageous to my estate, without confining themselves to such investments as the law directs for the investment of trust funds, hereby allowing them full power to select any investments or securities they may approve, except the capital stocks of corporations, and obligations not accompanied with reasonable securities, with full power also to the said trustees to change any such investments, whether left by me or made by them, and to convert and reinvest the proceeds whenever, and as often as they, in their judgment and discretion, may think most to the advantage of my estate. And I direct that the application of all the net income from my residuary estate, as I shall hereinafter define and describe it, shall be apportioned and divided between my wife and my children, so long as they shall all continue living, in the manner following, that is to say, until the first day of June, or the first day of December, next following my decease, there shall be paid unto my wife the sum of one thousand dollars per month, and to each of my five children the sum of five hundred dollars per month, until the said first day of December or first day of June, (whichever shall be the next succeeding my death,) shall arise, and from and after that date the whole of the net income of my said residuary estate, as I shall herein define and describe it, shall be divided and applied as follows: Four-tenth parts thereof unto my dear wife, Amelia Malvina Tower, for and during the term of her natural life, and the remaining six-tenth parts thereof shall be paid and applied in equal shares between my five children, Charlemagne Tower, Junior, Deborah Taylor Lee, wife of Richard Henry Lee, Emma Snyder, widow of Benjamin C. Snyder, deceased, Grace Williams Putnam, wife of Earl B. Putnam, and Henrietta Tower. At and after the death of their mother, the whole net income of my residuary estate, as herein defined, shall be divided in equal shares among my said five children during their respective lives, each after their mother's death receiving one-fifth part thereof. This receipt of net income by my children shall continue during their respective lives, and shall be free from liability to their debts, or the debts of any husbands they may marry, and from liability to attachment, or seizure in execution, and from all liability to be diverted from the personal use, benefit, and support of themselves and their respective families, by any process or device whatever. At and after the decease of each of my said five children, severally and successively, his or her share of the income from my residuary estate, as above designated, shall be appropriated and divided among the children and issue of deceased children of each one of my children, as he or she may successively die, in the same shares and proportions they would take in distribution under the intestate laws of Pennsylvania from their deceased parent; and in like manner the share of income which may accrue to any of my grandchildren, or more remote lineal descendants under this my will, and who may die before the period appointed for the distribution of the principal of my residuary estate, shall in like manner accrue to their children, and issue of deceased children, as above provided, and such payment or application of the income of a deceased child's or grandchild's share among his or her children and issue shall continue until the arrival of the period for division of the capital of my said residuary estate; and, if any one or more of my children or grandchildren shall die without leaving any issue to survive him or her, then the share of income theretofore appointed and payable to such decedent shall go to the other of my children or grandchil-

dren, (as the case may be,) then living, and the issue of any others of my said children or grandchildren, who may then be deceased, in the same way and manner in all respects as are limited and provided in respect to their original shares, which shall simply be augmented thereby, but in all respects governed by the same provisions as applied to their original shares: provided always, however, that I authorize and empower each one of my children or grandchildren, who may leave a husband or wife surviving him or her, by his or her last will and testament, or any writing in the nature thereof by him or her signed, to make provision for any surviving husband or wife either of them may leave surviving, to continue during life, but not to exceed one-fourth of the income which would have been payable to such testator or appointer if he or she had remained living. The period I appoint for the distribution of the capital of my estate, and the termination of the trust hereby created, is at the expiration of twenty-one years from and after the death of the last survivor of my children and grandchildren who' may be born in my life-time, if I may lawfully prolong such distribution until that period without violating the rule against perpetuities, which I do not design to violate; and, if that period shall be beyond what the rule against perpetuities will allow, then I designate at the expiration of twenty-one years after the death of the last survivor of my above-named ten children and grandchildren living at this date, and at such period I direct the division of all the capital of my residuary estate among all my lineal descendants then living, to each an equal fractional share thereof, without regard to their stock or the degree of their descent from me.

"*Item* 6. I consider all the rents and royalties derived from any coal lands, or other mineral lands, in which I shall be interested at the time of my decease, as part of the capital or principal of my estate, derived by diminution of the estates out of which they come.

"And whereas I own interests in several tracts of land producing anthracite coal, and may, at the time of my decease, own other properties from which rents or royalties from coal or minerals may be derived, I expressly direct that my executors and trustees shall hold, keep, and invest, as part of the capital of my estate, all such rents and royalties as they may derive from my coal lands, and other ore lands, and only appropriate and apply as income whatever shall be received by them as interest or income from the investments they shall make from time to time of such rents and royalties. I also further direct that all moneys to be received from and out of any corporation, company, or land association, in which I have an interest as shareholder, or otherwise, and out of the dividends declared by any ore or mining company, corporation, or association, in which I shall be interested, at the time of my death, as a shareholder or otherwise, shall likewise be deemed part of the capital of my estate, to be kept invested, as such, by my trustees, and only the interest and income from such investments to be carried into the income account for distribution during the continuance of the trusts hereby created.

"And I further request them to continue the method I have adopted on my books of keeping a separate account with each colliery, mineral, or coal property, in which I or my estate shall be interested, and I further direct that my executors and trustees shall not sell or dispose of any of my anthracite coal lands while they shall be producing rents or royalties, unless exceptionally full prices shall be obtained therefor, or some unforeseen contingencies may arise, which shall make it plainly unwise for them to retain them in my estate; and, before making any sale or disposition of the same, a majority of those living and over age, who, at the time being, shall have any beneficial interest in the income of my estate, shall give their consent thereto in writing.

"*Item* 7. I authorize and empower my said executors, and trustees, and their successors in the trust, to sell and dispose of any and all my real estate,

within any state or territory of the United States of America, and to make good and sufficient titles therefor, in fee-simple, unto the purchaser or purchasers thereof, without any duty or obligation on the part of said purchaser or purchasers to see to the application of the purchase money, which shall be paid to my said executors, and by them invested and applied according to the uses and trusts of my will. In executing this power, I except its application to the house and lot above devised to my wife for her life, unless she shall assent thereto, in writing, while she lives; and I especially request them to observe my requests in regard to the sale of any coal or mineral lands producing rents or royalties. I further forbid them to execute any deeds to purchasers from them which shall contain any warranty except against myself and all persons claiming under me, and not to execute any deeds with general warranty."

He then provides that the trustees of his residuary estate shall at all times consist of not less than three persons, names two persons to fill the first two vacancies, and then provides that thereafter, whenever the number of the trustees shall be reduced below three, the surviving and remaining trustees shall fill the vacancy, by appointment, with the approval in writing of a majority of those for the time being entitled to share in the income of his estate, and of full age, and shall have the appointees properly invested with the title to the trust property, in conjunction with such surviving or remaining trustees, the investiture of title to "be accomplished either by proper conveyances and reconveyances or by the action of the orphans' court of Philadelphia county, as may from time to time be deemed by counsel learned in the law most appropriate and effectual." He then provides for the compensation of the executors and trustees, "on the whole of the personal property whereof I shall die seised or possessed, three per cent.; on the proceeds of all real estate sold by them, three per cent.; on all coal rents, royalties, or payments derived from land associations, mining or ore companies or associations, and all the sources which I have directed to be deemed capital, three per cent.; and on the annual income of my estate yearly, as collected, four per cent." He gives to one of the executors additional compensation; directs that the keeping of the accounts of the estate shall be under his supervision; and requests "that, for the sake of showing the results of each one of my operations and investments, he will continue to keep all the books of the estate in the manner I have kept them in my life-time, by a continuation of the same accounts that I have kept, so as to show what shall be derived from such specific property or investment." He then provides for the manner in which all the moneys that shall come into the hands of the trustees shall be deposited and drawn, and for the safe deposit of all securities of his estate, and appropriates, for the use of the executors and trustees in carrying on the business of the estate, his office building and lot in the city of Philadelphia, and provides that, if it shall become necessary or expedient to remove therefrom the office of the estate, the rent and expenses of other suitable offices shall be allowed to the executors, and "then the premises above designated may be rented, or sold for account of my estate, under the powers hereby vested in my said trustees." Then, after providing that the income on the residuary estate shall be free and clear of liability to be anticipated or assigned by any of the beneficiaries, or diverted by any process from being applied to their proper maintenance and support, he declares that "no disturbance or distribution, under any pretext, is to be made of what I have declared to be the capital or principal of my residuary estate, until the period which I have hereinbefore designated." He then directed that the payments of income to the beneficiaries should be quarterly, and that the provisions made in the will for his wife should be "in lieu, substitution, and satisfaction of her dower, thirds, and all other interests in my estate, real, personal, and mixed." From the submission, it further appears

that the lands, which are situated in this state, are farming lands, and city and village property, and none of them are mineral lands; that the real property, devised by the will, consists largely of lands in Minnesota, North Dakota, and Washington, about 50,000 acres, but they are chiefly undeveloped; that the inventory of the personal estate shows the valuation thereof to be something over $6,000,000. The five children named in the will all survived the testator, and are now living, of full age, and are parties to this action. The widow also survived, is a party here, and has accepted the provisions made in the will for her benefit in lieu of dower. The executors and trustees have taken possession of the real estate.

The questions submitted are: (1) Are the provisions of said will, so far as they apply to and affect the said real property situate in the state of New York, valid, and in accord with the statutes of said state, relating to the suspension of the absolute power of alienation of the estate? If this question is answered in the affirmative, the judgment is to be rendered against the said heirs at law of Charlemagne Tower, deceased, and in favor of the said executors and trustees, declaring the said provisions of the will valid. If this question is answered in the negative, then judgment is to be rendered against the said executors and trustees, and in favor of the said heirs at law of Charlemagne Tower, deceased, declaring said provisions of the will void, and that the said real property thereby descends to the heirs at law of Charlemagne Tower, deceased, as if he had died intestate. (2) If the foregoing question is answered in the negative, and the provisions of the will, so far as they relate to and affect the said real property situate in the state of New York, are declared invalid, then the right of dower therein of the said Amelia Malvina Tower, widow of the said Charlemagne Tower, deceased, and her interest in said real property as such widow, are to be determined by the judgment rendered herein.

Argued before HARDIN, P. J., and MARTIN and MERWIN, JJ.

*Henry T. Utley,* for plaintiff. *Earl B. Putnam,* for defendants.

MERWIN, J. By the statute of this state in regard to real property, (4 Rev. St., 8th Ed., p. 2432, § 15,) it is provided that the absolute power of alienation shall not be suspended for a longer period than during the continuance of not more than two lives in being at the creation of the estate. That the provisions of the will in question are repugnant to this statute, and the trust therefore invalid, as one relating to real estate, (*Brewer* v. *Brewer,* 11 Hun, 147, 72 N. Y. 603; *Amory* v. *Lord,* 9 N. Y. 413,) is practically conceded by the defendants. They, however, claim that this is a case where the doctrine of equitable conversion should be applied, so that the will should be construed as if the whole estate was personalty, and that upon this theory the law of the state of Pennsylvania would govern in the construction, and the trust under that law be valid. *Phillips' Appeal,* 93 Pa. St. 45. It seems to be conceded on the part of the plaintiffs that, if there is an equitable conversion, the will is governed by the law of Pennsylvania, and therefore valid. The question to be determined therefore is whether or not there is here an equitable conversion. The general rule on this subject, as stated in *White* v. *Howard,* 46 N. Y. 162, is that, to constitute a conversion of real estate into personal, it must be made the duty of, and obligatory upon, the trustees to sell it in any event; that such conversion rests upon the principle that equity considers that as done which ought to have been done; that a mere discretionary power of selling produces no such result. There is here no express direction to sell, but the point of the defendants is that the evident design and intention of the testator, as shown by the whole scheme of the will, and particularly by the directions as to the immediate investment of the whole of the capital of the estate, and as to the ultimate division of the capital, in connection with the terms employed, point to the immediate conversion of the estate into money. In *Phelps'*

*Ex'r* v. *Pond*, 23 N. Y. 69, it was said that, where a testator authorizes his executors to sell real estate, and it is apparent from the general provisions of the will that he intended such estate to be sold, the doctrine of equitable conversion applies, although the power of sale is not in terms imperative.   In the same case in the supreme court, (28 Barb. 121,) the subject is more fully discussed, and the same conclusion reached, it appearing that the most important purposes and provisions of the will called for such conversion, and to be incapable of execution without it.   In *Fisher* v. *Banta*, 66 N. Y. 468, there was an absolute direction to sell.   In *Power* v. *Cassidy*, 79 N. Y. 602, the testator gave all his estate, real and personal, to his executors in trust, with power to sell, and out of the proceeds of sale, or of the income, to pay to his wife a specified annuity for life, in lieu of dower, and his residuary estate he gave one-third to his wife, one-third to a nephew, and the balance to his executors, to be divided by them among such institutions of a certain class as the executors should decide, and in such proportion as they should think proper. It was held that there was an equitable conversion, it being said by MILLER, J., that the estate could only be effectually divided, and the purposes of the will efficiently carried out, by converting the real into personal, and that any other construction would necessarily interfere with the accomplishment of the benevolent designs of the testator.   In *Lent* v. *Howard*, 89 N. Y. 169, it was held that, when the general scheme of the will requires a conversion, the power of sale, although not in terms imperative, operates as a conversion, and this will be deemed to be immediate, although the donee of the power is vested, for the benefit of the estate, with a discretion as to the time of the sale.   In this case, the executors, after paying debts, and carrying out certain specified provisions, were directed to invest all the balance and remainder of the estate in personal securities.   In *Newell* v. *Nichols*, 75 N. Y. 78, the testatrix gave her residuary estate to trustees, in trust, to set apart, sell, or otherwise dispose of the same, at their discretion, and invest the proceeds so as to make two funds of $15,000 each, and one of $30,000, the income of each fund to be paid to different parties during life, and, at the death of each respectively, the principal to be paid to certain parties as in the will specified.   The estate was not fully adequate to create the contemplated trust fund of $60,000.   It was held that there was not an equitable conversion at the death of the testatrix, the power to sell being discretionary.   In *Hobson* v. *Hale*, 95 N. Y. 588, the will, after various legacies and devises, and after providing for the payment of life annuities to 12 different persons, contained this provision: "As to the residue and remainder of all my estate, both real and personal, not herein otherwise disposed of, it is my will that the same be and remain in the care and custody of my said executrix, and executors, and trustees, and their successors, well and safely invested until the decease of the last survivor of the life annuitants; and that then the said residue and remainder, with all the accumulated interest thereof, shall be divided equally among my grandchildren, *per stirpes*."   There was no express direction for the conversion of the real estate into personalty, or for its sale.   It was held that there was no equitable conversion, it being said by MILLER, J., that, in order to uphold a conversion of real estate into personalty in the absence of express words, there should be such an implication of the testator's desire as to leave no question in regard to it.   In *Chamberlain* v. *Taylor*, 105 N. Y. 194, 11 N. E. Rep. 625, it is said that equity will never presume a conversion, unless it is demanded to accomplish the lawful purposes expressed in the will of the testator.   In *Asche* v. *Asche*, 113 N. Y. 235, 21 N. E. Rep, 70, it is said that the necessity of a conversion to accomplish the purposes of a will is equivalent to an imperative direction to convert, and effects an equitable conversion.   In *Scholle* v. *Scholle*, 113 N. Y. 270, 21 N. E. Rep. 84, it is said that, to justify such a conversion, there must be a positive direction to convert, which, though not expressed, may be implied, but, in the latter case, only when the design

and purpose of the testator is unequivocal, and the implication so strong as to leave no substantial doubt. Many other cases are cited in the elaborate briefs of counsel upon either side, but it is not important to consider them in detail. Enough have been referred to to indicate the general principles applicable to the subject. It is a question of intention, and in such a case, as said by Judge EARL in *Delafield* v. *Barlow*, 107 N. Y. 540, 14 N. E. Rep. 498, precedents are not very valuable when the decision must be based upon the peculiar phraseology of the entire will.

In the present case the testator was the owner of a large estate, real and personal, and very evidently designed to have the body of it kept together as long as it could legally be done. The income was only to be used, for the benefit of his widow and lineal descendants, until a period that, under ordinary circumstances, would be far in the future. After making partial provision for his wife in connection with his dwelling-house, and the property connected therewith, all the rest of his property was placed in trust. He called it "his residuary estate," and in his mind it was separated into "capital" and "income." The capital or principal was to be held and preserved, the income was to be distributed from time to time among the beneficiaries. The trustees were directed to hold, manage, and appropriate the estate, collect the rents, issues, profits, income, dividends, and gains, invest and keep invested the capital, so as to make it as productive as reasonably could be. They were directed to preserve such investments and securities as he should leave standing in his name, so long as they deemed it prudent, and might make such new investments as they, in their best judgment and discretion, should deem advisable and advantageous to the estate, without being confined to such investments as the law directed for the investment of trust funds, and they were given full power to select any investments or securities they might approve, except the capital stocks of corporations, and obligations not accompanied with reasonable securities. They were given full power to change any such investments, whether left by him or made by them, and to convert and reinvest the proceeds whenever and as often as they thought most to the advantage of the estate. He directed that any rents or royalties, which his trustees might receive from his coal or ore lands, as well as any moneys received by them from and out of any corporation or land association in which he had an interest, and out of dividends declared by any ore or mining company in which he was interested, should be deemed part of the capital of the estate, and that his trustees should not sell or dispose of any of his anthracite coal lands while they shall be producing rents or royalties, unless exceptionally full prices should be obtained, or some unforeseen contingencies arise, which should make it plainly unwise for them to retain the property, and, before any sale or disposition of the same, a majority of the beneficiaries then living, and over age, shall give their consent in writing. He gave his executors and trustees power to sell any of his real estate within any state or territory, except that the house and lot devised to his wife for life should not be sold without her written assent, and except that he requested them to observe his requests as to sale of his coal lands. He requests that the books of the estate shall continue to be kept as he has kept them in his life-time, by a continuation of the same accounts that he has kept, so as to show what shall be derived from each specific property or investment. He provided that the office building and lot, if not used by the trustees, might be rented or sold. At the termination of the trust, he directed the division of the capital of the residuary estate among all his lineal decendants then living, to each an equal fractional share thereof. These are the main provisions of the will, so far as the question before us is concerned. There is an evident design that the management of the estate should be continued in the same line upon which it had been managed. The accounts kept by him are to be continued. No radical change was contemplated. They were required

to invest and keep invested the capital of the estate, so as to make it as productive as it reasonably could be, and still, in doing so, they were directed to preserve, as long as they deemed prudent, such investments and securities as the testator should leave standing in his name. In making new investments, they were not restricted to personal securities, but might select any investments or securities they approved, except capital stocks of corporations and certain obligations. They could change and reinvest in their discretion.

Of the investments left by the testator, the real estate in this state is a part. It consists of farming lands, city and village property. Under the terms of the will, the trustees had a right, if they deemed it prudent, to preserve this investment during the entire continuance of the trust. The anthracite coal lands, independent of the discretion of the trustees, could not be sold without the consent of a majority of the beneficiaries, at the time, of age. This property might therefore remain till the end of the trust. The office building and lot might be rented or sold. A large amount of western lands was held by the testator, said to be chiefly undeveloped. There is no specific reference to them in the will. There is nothing from which the inference can be fairly drawn that the testator designed an immediate sale of these. They were a portion of the *corpus* or capital of the estate, a part of the testator's investments. It was for the trustees to say when it was prudent to sell. But it is said that the direction for a division at the close of the term is a controlling circumstance. It is not stated who shall make the division. Nor is the direction to divide and pay, as in some of the cases cited. Even then it would not necessarily follow that a conversion was intended. *Chamberlain* v. *Taylor*, 105 N. Y. 191, 11 N. E. Rep. 625. A sale of the coal lands might be prevented by the parties in interest. Whether or not a sale of the whole or a portion of the estate would be convenient for the purpose of division among the beneficiaries would depend upon the number then of the beneficiaries, and the condition then of the estate. A sale might or might not be desirable. We cannot assume that the testator would or did determine in his own mind those contingencies, in the absence of an express statement to that effect. The form of investment was left optional with the trustees, so that the testator could not intelligently determine that a conversion was proper or necessary in the distant future. The estate was large; the capital was likely to be increased in the accumulation as capital of rents and royalties of coal lands. It is not probable that the testator would design to have thrown upon the market, for conversion, simply for the purpose of division, such an estate as his trustees then might have in hand. The will was carefully drawn, and it may be said, with a good deal of force, that the testator expressed all he designed in the matter of sale, and that, if he had intended a conversion, at all events he would have said so. The foregoing considerations lead to the conclusion that there is here no sufficient basis for saying that the testator intended that his real estate should at all events be sold and converted into personalty. It was designed by him to be left discretionary with his trustees, and therefore there is no equitable conversion.

We are further called upon to determine the right of dower of the widow of the testator, and her interest in said property. The submission states that she has accepted the provisions of the will in lieu of dower. Under the will, she was entitled to receive during her life two-fifths of the net income of the estate. That, in substance, would have given her two-fifths of the income or rents of the real estate in question. Of that, she is deprived by the result of this action, and the question is whether, as against the heirs, she should not be restored to her legal rights, so far as this property is concerned. This would be in accordance with the views of the chancellor in *Hone* v. *Van Schaick*, 7 Paige, 233, and of the supreme court in *Manice* v. *Manice*, 1 Lans. 378. The case would be somewhat analagous to the eviction of a widow of her jointure when, it is said, the effect is to remit the widow to her dower *pro tanto.*

:2 Scrib. Dower, (2d Ed.) c. 15, § 84.   I am of the opinion that the heirs are not in a position to enforce against the widow her election.   Having, as to this property, repudiated the trust to the lessening of the widow's income to the extent of more than the benefit of her dower, they have no right to say that, although their estate as heirs is restored, her estate as widow is not.   Their repudiation of the trust to her loss places her in a position to insist, as against them, upon her legal right in order to retrieve her loss.   They cannot take away the consideration for her election, and still say she is bound by it.   They are restored to their rights as heirs, and those rights are subject to her dower. It follows that, in accordance with the submission, judgment should be rendered in favor of the heirs, declaring that the provisions of the will, so far as they apply to and affect the real property in this state, are invalid, and that the said real property descends to the heirs at law of the deceased, as if he had died intestate; and also declaring that the widow is entitled to dower in the said real estate.   Each party to have costs, as provided in the submission.

All concur.